## UNITED STATES v. 49,375 SQUARE FEET OF LAND IN BOROUGH OF MANHATTAN, CITY OF NEW YORK et al.

United States District Court
S. D. New York.
Jan. 17, 1950.

Supplemental Opinion July 20, 1950.

Harry T. Dolan, Special Assistant to the Attorney General of the United States, for petitioner-plaintiff.

Boyle, Feller,. Stone & McGivern, New York City, for defendants, by Philip W. Haberman, New York City, of counsel.

KENNEDY, District Judge.

#### The Proceedings.

Pursuant to a request made by the Administrator of Veterans Affairs, the government on July 1, 1947, filed a petition for the condemnation of 49,375 square feet of land (252 Seventh Avenue, N. Y. C.),

owned by the defendant Tishman Realty & Construction Co., Inc. (hereinafter called Tishman). On July 9th, by order to show cause, the government sought immediate possession. By order dated July 25, 1947, possession was granted as of July 1, 1947. On July 28, 1947, a declaration of taking was filed and a deposit made of $3,000,000. On the same day a judgment was entered upon the declaration of taking. Title, therefore, vested in the government on July 28, 1947 (the date of the filing of the declaration and the deposit).

On September 2, 1947, an interlocutory judgment of condemnation was entered which, among other things, ordered that the court fix the just compensation due Tishman.

By order dated August 14, 1947, Tishman, out of the money on deposit ($3,000,-000), received $754,870.38 as owner, and the mortgagee, Metropolitan Life, received from the same source $2,245,129.62.

This case was orginally assigned to the late Judge Bright. Pursuant to stipulation (October 7, 1947) and order (October 13, 1947) the trial of the issue was held before me in the Eastern District on March 3, 4, 7, 8 and 9, 1949. On March 31, 1949, a view of the subject property, and also of the comparable properties, was taken by the court.

### The Issues.

There are two questions presented, but each party states them differently because, although title passed on July 28th, possession was in the government from July 1, 1947.

The government claims that the two questions are:

(1) What was the fair market value of the subject property on July 1, 1947?

(2) What additional compensation must the government pay because of possession antedating the vesting of title?

The defendant says that the cause poses these two questions:

(1) What was the fair market value of the property on the date of the taking (July 28, 1947)?

(2) What was the *fair rental value* for the period between July 1, 1947 (possession granted government) and July 28, 1947 (when title passed)?

Now, on the fee question, the disagreement as to the controlling date seems quite immaterial, because there is no proof in the record that there was any substantial or material difference in the value of the property between July 1 and July 28, 1947.

The government, however, claims that the owner, under settled authority, is not, under the circumstances of the case, entitled to a rental award. It does, however, concede that the owner is entitled to interest at the rate of 6% per annum on the market value of the property, as established by the court, for the 27-day period.

The importance of the second controversy is clear when one considers that interest at the rate of 6% on a $5,000,000 valuation would amount to less than $25,000 ($15,000 if a $3,000,000 valuation is taken). On the *rental* theory, based on obtainable rents, the award would be, according to one of Tishman's witnesses, Joseph, about $90,241.76. The Tishman witness Goode placed the figure at $64,225.

### The Property.

I give now the facts concerning the property, deriving them in large part from a report placed in evidence (Def.Ex. 3) by claimant. The building in question covers the entire area of the property which is on the west side of Seventh Avenue between 24th and 25th Streets, having a depth of 250 feet for the entire width of the property. The improvement consists of three 16-story and two 11-story buildings which, although they form a single unit, were built at different times. The building was originally built for heavy manufacturing purposes. There is a cellar as well as a subcellar below the sidewalk level, and sidewalk vaults on all three street fronts which extend from the building line to the curb on the side streets and to the subway line of taking on Seventh Avenue. The buildings form a "U" shape.

The first unit was built in 1905 and fronts on 24th Street. It is 11 stories high with

a street frontage of 128′ 6½″ with a depth of 87′. That unit is referred to as unit "R".

Unit "S" was constructed in 1910. It lies directly to the east of "R". It is 11 stories high with a frontage of 43′ 3½″ on West 24th Street and a frontage of 46′ 6″ on West 25th Street. This building is divided into two sections ("S-South" and "S-North"). In 1914 "S-North" was extended an additional 5 stories.

At the same time (1914) Unit T and U were constructed. Unit T fronts 197′ 6″ on Seventh Avenue and 78′ 3″ on West 25th Street. It is 16 stories in height as is Unit U, which fronts 125′ 3″ on West 25th Street, having a depth of 70′ 7″.

During 1942 the then owners, Metropolitan Life Insurance Company, completely renovated the buildings, installed new banks of express elevators, installed modern toilets and wash rooms on all floors and constructed a new lobby on the Seventh Avenue front. The improvements made the building suitable for high class office, show room and loft purposes.

The building, as a whole, is steel skeleton type with steel stairs throughout. Toilet and wash rooms have tile floors and base and toilet stalls are of steel. The lobby on Seventh Avenue has a terrazzo floor, marble wainscote, marble floor to ceiling where elevator doors occur, hung ceiling with concealed lighting, and decorative wall finishes. The building is also equipped with a package chute, mail chute and rubbish chute. It is plastered and painted throughout. There is a complete steam heating plant. (At the time of the taking and since, steam was however being obtained from a public utility.) All sections of the building are equipped with sprinklers. There is light and power wiring throughout.

The building is equipped with 18 passenger and freight elevators now in active service, and 3 additional elevator shafts which can be used in the future.

### History of the Subject Premises.

The original owner of the building was the National Cloak & Suit Company, which conducted a mail order business. A concern called National Bellas-Hess Co. took over the building, but in 1932 it surrendered the property to the Metropolitan Life Insurance Co., the mortgagee, in lieu of foreclosure. The building remained vacant until 1942 when it was adapted to the needs of the Veterans Administration at a cost of over $1,300,000 to the mortgagee. The government went into possession on February 20, 1942, under a lease at an annual rental of $320,000, or approximately 45¢ per square foot.

On October 10, 1945, Tishman, through a professional "dummy", purchased the premises for $2,800,000. It says now that this purchase was made for long-term investment purposes. The preliminary discussion of the transaction occurred just after V-J Day, and although the property was taken subject to the lease, the latter contained a 60-day cancellation clause which, in claimant's opinion, the government would shortly invoke. During Tishman's ownership, and prior to the commencement of these proceedings, the government made certain improvements, but these do not enter into the case.

When Tishman took the property it was, of course, subject to the Emergency Rent Law, McK.Unconsol. Laws, § 8521 et seq., a fact of which Tishman was aware. Between October 1945 and June 1, 1947, Tishman accepted rent from the government under protest, and on July 1, 1947, it instituted an action in the New York Supreme Court in order to bring about a termination of the lease. It was, it will be remembered, on this date that the government filed its petition in this proceeding.

It may as well be noted at this point that between the years 1944 and 1948 the assessed value of the land on which the subject premises stand never changed from the figure of $615,000. The assessed value of the building, however, climbed from $1,285,000 (1943–1944) to the sum of $2,185,000 (1947–1948). It will be seen that in the year 1945 when Tishman purchased the property for $2,800,000 the assessed value (land and building) was $2,100,000; at the date of the taking in 1947 the assessed value (land and building) was pre-

cisely the same figure which Tishman had paid two years earlier. During the government's occupancy the building was, in point of fact, converted from a loft manufacturing building to an office building, and in this connection it became necessary to install air conditioning, partitions and other facilities to meet the requirements of the form of occupancy.

Experts for the government now say that the premises are worth from $2,750,000 to $3,000,000. The value placed upon the property by the claimant is $5,000,000, in addition to which it seeks, as has been said, an amount equal to the rental value less expenses for the period July 1 to July 28, 1947. Putting to one side the dispute over the subsidiary question of the value of occupancy for the short period prior to the passing of title, the striking feature of the case is the very wide discrepancy between the two estimates of fee value. That discrepancy is explained almost wholly by the fact that the government relies upon one standard of value, and the claimant upon another.[1]

## Standards of Value.

In cases involving just compensation, it seems a pity that over the course of the years a jargon of the trade has developed, largely by the experts, and that controversies over value have tended to become a battle of abstractions. At the trial of the case at bar, for example, and in the briefs of counsel much time and space were consumed by discussion of the relative merits of (1) the reproduction method, (2) the comparison method, and (3) the summation method. Behind all this was the implication that in any given case the technique of decision is first to select one of several formulae of valuation, and then to apply that formula to the bitter end. To do this is to make inevitable a wrong result. The object of the process of fixing just compensation is to find, if possible, a market value. And it has become axiomatic that this process does not even remotely resemble the working out of a mathematical formula

and the application of it; the result is never any better than an informed guess.

However, it is necessary to consider the so-called standards debated at and after the trial of this cause, if only to clarify what is to be said.

The government stood squarely on the position that the only correct standard applicable to the facts was the so-called comparison method, under which the subject premises are valued in the light of actual sales of comparable properties at approximately the time when the subject premises were taken and somewhere near the place where they are located. Merely to attempt to define this method is to expose the fact that it is bound to be inaccurate in many instances, and in some cases may not be usable at all.

The claimant, on the other hand, says that while the comparison method should not be discarded altogether or even overlooked, there is only one really intelligent way to appraise business property, namely, under what it calls the summation method. The first step in this system is to arrive at the value of the land, using comparable sales as a guide. Next, the gross income from the premises is calculated, expenses are deducted, and a net income figure is reached. Then a portion of this income is allocated to land, and the remainder capitalized at what is considered a reasonable percentage of return over what is thought to be a reasonable time (in this case at least 20 years). Again, merely to state the theory is to make obvious many difficulties and inaccuracies.

A third method of appraisal is somewhat tentatively and timidly put forward by the claimant, namely, the reproduction method. Here an expert is called upon to give his version of the sound value of the building by estimating what it would cost to reproduce it, and then deducting a fair amount for depreciation. This "method" is perhaps the most excellent example conceivable to demonstrate that none of such abstractions ought to have a place in the

1. This may seem to be an over-simplification of the matter because, as will be seen, each side makes an attempt to reconcile its estimate with all of the most reliable approaches to the question that can be used in a case like this.

search for market value, generally speaking.[2] The use of that method here (and, by the way, the claimant does not contend it should be used even though it called evidence on the point)[3] would lead to this result: a piece of property for which the claimant paid in 1945 $2,800,000, which under the comparison method is worth some $3,000,000, and which under the claimant's summation method would be worth roughly $5,000,000, would cost the government $7,-753,641. But on broader grounds, and ignoring the fact that on the figures an absurd result is reached, it is apparent that the reproduction method is in itself absurd in the ordinary case, because even in ordinary times it is ridiculous to suppose that anyone would think of reproducing this or any like property, and that same thing would be true in the vast majority of cases, I should think.

I intend to say nothing, or as little as possible, about the inherent virtues of any one of these methods of appraisal, as applied to the case at bar, because to do so is simply to ignore the repeated admonitions of the Supreme Court, mentioned before, concerning the principle governing proceedings like this: that just compensation is market value. No one has yet succeeded in evolving a formula for market value which is universally appropriate; the method is empirical throughout, and the result is no better than a guess.

In the case at bar, valuation formulae which are capable of being defended as abstractions are particularly inappropriate and unreliable because of the peculiar location of the subject premises.

### Peculiarities of the Area.

When I took a view of the subject premises and the surrounding area, and heard evidence on the point, I was impressed by the fact that in Manhattan cer-tain industries tend to gravitate into an area of comparatively narrow confines, and that the boundaries of these areas are very clearly marked.

For example, it is well known that 28th Street is the southern boundary of the fur district and that the northern boundary is 31st Street. In both instances that particular area is bounded on the west by 8th Avenue and on the east by 6th Avenue. Similarly, the garment industry is centered between 34th Street and 39th Street, and between the same avenues.[4] Within those areas are to be found large loft buildings, well constructed and well maintained. And naturally, because of the fact of concentration, the demand for space within those districts is strong and constant.

Again, the particular area in which the subject premises is located is exceedingly well served by transportation facilities. Subway and surface lines are available at every point conceivable, and as one witness for the claimant said, speaking of transit facilities, "everything is within a block away".

It is easy, therefore, to make a plausible argument, as the claimant in fact does, that the subject premises are "ideally located". And it would be highly natural to suppose that property, originally constructed for use as a loft building, within a few blocks of the fur area and not very far south of the busy garment area, has great possibilities. To cap its argument the claimant, through its witnesses, talks about what it calls the "men's garment industry". This it describes as occupying the area from 14th Street up to 28th Street and 5th Avenue. Actually, however, I do not believe that there is any such thing as a men's clothing manufacturing district in New York City. My own observation supports the position of the government that the area in question is actually occupied by a conglomera-

---

2. I know well that there are situations in which the courts have been driven into using reproduction cost as a guide to value. I mean to say merely that those situations are certainly unusual.

3. One of claimant's experts seems to suggest that he made considerable use of reproduction cost, although I don't believe he meant it (e. g., Goode, S. M. 162–164).

4. The same phenomenon of concentration occurs in respect of the millinery business, and to a lesser extent in the department store industry and in the life insurance business.

tion of jobbers. But even putting that point to one side, it may, as I have said, be plausibly urged that a building located so near to such busy districts as the fur and garment districts and so well served by transit facilities would, in the nature of things, ultimately be in demand for those industries, or either of them, just as much as the buildings only a few blocks further to the north.

But the contrary is true. There is not only a tendency in these industries to concentrate but also, as I have said, a tendency to confine themselves within fixed boundaries. The matter is not to be explained on logical grounds: it must be conceded that on the surface the concentration of these industries seems to violate every rule of common sense. At least that is so until one considers that buyers and other persons who form the outlet for the products of the fur and garment business apparently refuse to wander very far when they are making their selections. As things are now arranged, a fur buyer is able to visit any one of the major producers with scarcely any personal inconvenience in the way of travel. And the same thing is true with respect to the garment industry.

It is undoubtedly this set of circumstances which explains why the subject premises after remaining vacant for ten years (1932 to 1942) was remodeled at a considerable expense ($1,300,000) by the former owner, the Metropolitan, not as a loft building but as an *office* building. The premises are a mere two blocks south of the southern boundary of the fur industry. Yet it is obvious that to make it suitable for the particular industry would mean cutting it up into small units, at a very large expense and a considerable diminution of income, with the strongest of probabilities that no fair portion of the furriers would ever migrate south of the sacred precincts of their own district. The area in which the subject premises are located was prominent once—in 1880—and then principally as a theatre district. It has never regained that prominence and is now in fact characterized correctly by one of the government's witnesses, at least as far as my observation extends, as a nondescript and blighted section of the city. If one thinks this is a tall statement, it is only necessary to visit the district or look at some of the photographs in evidence for confirmation on the point. It is not so much that the subject building is old,[5] it is rather that the original builder guessed wrong. And in passing it may be said that a migration of the fur industry (like the theatre district) could very easily blight the district on the west side between 28th Street and 31st Street, although under present conditions with respect to the cost and difficulties of construction it is unlikely that such a migration could occur in the foreseeable future.

The space here given to consideration of the facts just mentioned is, I think, warranted; because those facts have a distinct bearing on the future utility of the subject premises, and they explain why little weight can be given to some of the speculation of the experts.

### Land Values.

What has just been said will explain many eccentricities in the valuations that the experts at the trial put upon land sales and land values of properties fairly near the premises in suit, and transactions fairly close in point of time both to the original purchase by the claimant (1945) and the year of taking (1947). It must be obvious from what has been said that land sales (to say nothing of building values) north of 28th Street on 7th Avenue can be safely ignored,[6] because actually there is no equivalence to be found in such sales. Land sales south of the subject premises, both on 7th Avenue and on the side streets are helpful to some extent. But in practically all of the instances brought forward there was no attempt to assemble plottage equivalent to that of the premises involved. Assessed valuations are a treacherous guide, because,

5. Construction was begun in 1905; additions were made in 1910 and 1914; and, as has been said, the building was remodeled in 1942.

6. E. g. government's exhibit S.

after all, these amount to nothing more than the opinions of an expert not before the court. In the case of the subject premises, the land value for purposes of assessment remained constant at a figure of $615,-000 for all the years between 1942 and 1947. The government says that the land was not worth that much at the time of the taking— that its value was $550,000. The claimant's experts contend for a value of $1,000,000. Concerning side street property, as such, there is not much disagreement: the government says a fair value is $6 per square foot, the claimant says its true value is $5 per square foot, all of this on 24th and 25th Streets just west of 7th Avenue.[7] The disparity between the two expert estimates is produced by a sharp disagreement over the valuation of the Seventh Avenue portion of the property on two points: (1) the government says that the "standard" value of a Seventh Avenue lot is $12 per square foot, the claimant says that value is $20 per square foot, and (2) the claimant insists that an increment should be added for depth on the Seventh Avenue lots to the extent of 200 feet, the contention of the government being that these lots are to be considered Seventh Avenue property only as standard units, 100 feet in depth, and beyond that merely as side street lots.

The disagreement last mentioned can be quickly disposed of. In order to make intelligent comparisons between the values of lots varying in depth (where that factor is important), real estate experts have in the course of time evolved certain rules of thumb which are now treated as being entitled to the same respect as the calculations of Einstein.[8] Actually the matter is very simple: the claimant elects to treat four of the side street lots on 24th Street and four on 25th Street as not side street lots at all but as part of the Seventh Avenue frontage, at least to the extent provided for in the rule which he favors. The government, on the other hand, elects to

treat 12 lots more than 100 feet from Seventh Avenue as side street lots and to value them on that basis. If one is to attempt to divorce the value of the land from that of the building, as seems to be necessary, then clearly the government's approach has a greater appeal to real conditions and common sense than that of the claimant.

Again, to attempt to value the whole parcel of land on an over-all square foot basis is not easy. The building here involved stands on a very large parcel of land (49,-375 square feet). The over-all square foot value put on the land by the government is $11.14. Although it does not specifically say so, the claimant's value would be $20.25 per square foot. On October 30, 1945 premises on Seventh Avenue between 25th and 26th Streets were sold by the Metropolitan. The government shows the square foot value of the land revealed by that sale as being $17.88 per square foot. Claimant criticises the sale because it says that, as in the case of its own purchase from Metropolitan, this transaction was part of a liquidation process by the seller—a process which was forced on the Metropolitan by the Insurance Law of the State of New York, Consol.Laws, c. 28. Claimant is bound to say this because even allowing for an enhanced value between 1945 and 1947 (and there is considerable doubt about this concerning land alone) an over-all square foot price of $20 on the subject property could never possibly be justified by comparison with the other sale I have mentioned. That sale (263 Seventh Avenue) involved a parcel of land occupying the entire block front on Seventh Avenue and running east 100 feet on 25th and 26th Streets. If one accepts a $6 square foot value on what may be called the back portion of claimant's premises (12 side street lots; 30,000 square feet), a total value for this part of the property of $180,000 is reached. Deducting this from the $1,000,-

7. On both sides the experts seem to detect a ratio between side lot value and front lot value. The government's ratio is 50%; the claimant's, 25%.

8. These are the Hoffman-Neill rule and the Davies rule, which latter figures very largely in the calculations of the claimant's main expert, and the use of which adds some $686,000 gross to the value of the land involved.

000 claimed for all the land of the claimant, the front (Seventh Avenue) portion of claimant's premises must be worth $820,000, and the same value must be assigned to the land (practically across the street) on which 263 Seventh Avenue stands. This the city assesses at $465,000, and even allowing for all the questionable and misleading elements involved in city assessments, the result is out of all reason. I hasten to say that claimant would argue that its premises are to be given the benefit of the Davies rule while property across the street occupying the most valuable portion of the block frontage does not have that advantage.[9] I can only say that the disparity that I have mentioned is only one more indication that any depth rule is wholly inapplicable to valuations in this case.

There seems to be little doubt that claimant's property is entitled to the benefit of what is called "corner increment", and "plottage". These terms are so familiar in connection with the valuations of city property that I think they need not be explained. The government in its estimate has made liberal allowances for both of these elements. Claimant contends that it should also be given an allowance for "key plots", meaning an increment for plots adjacent to the corner. In the present instance I think this is just one more theoretical concept that had best be here abandoned without further discussion.

I find as a fact that claimant's side street lots (approximately 30,000 square feet) were worth at the date of the taking $177,750 ($6 per square foot). This leaves only for consideration valuation of the remaining 19,750 square feet fronting on Seventh Avenue, with two corners. It is my finding and belief that this portion of the plaintiff's premises was at the date of the taking worth $15 per square foot on a standard lot basis. Allowing for corner incre-

ment (50% on two corners) this yields $333,750. Plottage increment on the whole tract at 25% is $127,875. The total value to be put on the land is therefore $639,375, or in round figures $640,000.[10]

### The Building.

#### A

As I indicated at an earlier point, the battle between the experts at the trial was largely over standards of valuation.

The claimant urged that so far as the building is concerned, the only approach is to capitalize potential net income. Comparative values based on sales, under this method, figure only in the valuation of the land. But the first step, says the claimant, is to discover how much per year over a fairly long period the building will yield. Taking first the basement, it says that fair rental value of this portion of the property is 25¢ per square foot. The ground floor is estimated to yield $2 per square foot, the second to fourth floors inclusive $1 per square foot, the fifth to the eleventh floors inclusive $1.10 per square foot, and the twelfth to the sixteenth floors inclusive $1.33 per square foot. The total of these figures is $775,000. A safety factor of 10% is applied to cover vacancies and non-paying tenants. This reduces the gross potential rental to $697,500. According to claimant, real estate taxes will amount to $145,000 (based on a $5,000,000 valuation) and average operating expense $180,000. Deducting these expenses, the potential net income is $372,500. 5% of this income is attributable to the land value, as seen heretofore, at $1,000,000. In this way claimant arrives at a balance of income attributable to the building in the sum of $322,500. This figure capitalized gives a value for the building of $4,030,000. 8% in the way of return is used in this part of the calculation. It is claimed that there ought to be an average interest return of 5% on a declining balance, and

---

9. In this connection it may be pertinent to point out that the claimant seems to take the position that normally and generally city assessments represent about 80% of the value of the property assessed. If my figures are right, claimant

must be implying that both 263 Seventh Avenue and the subject premises are now assessed at somewhere about 60% of their real value.

10. The ratio between side lots and front lots under this valuation is 40%.

sufficient additional to pay off the principal sum in 20 years. Of course, the period of amortization will be increased if the owner retains anything over 5%, or if he uses the so-called straight line method.

The value put upon the building by the government is $2,450,000. Here the calculation is fairly simple: on the basis of all the information available furnished by sales of comparable properties, a square foot unit is said to be worth $3.50. This yields a total roughly of $2,430,000, which in its summary the government calls $2,450,000 (since it uses 700,000 square feet, instead of the exact figure).

The expert for the government was asked for his own views on the value of the property under the capitalization method. He said that the property was worth $2,929,000. For rent he used a figure of $368,000 which is 15% above the amount paid by the government prior to the taking ($320,000). A proper allowance for vacancies, according to the government, would be 5%. Taxes, water charges, insurance and outside repairs would yield a total expense of $120,880 and the net income left would be $247,120. Capitalized at 6% for the land, 6% for the building and 3% for depreciation, this gives a total value for the building of $2,929,000. Under this calculation the investment would be amortized in 20 years.

It will be observed at once that there are comparative minor discrepancies between the experts concerning such matters as taxes and vacancy allowance. Moreover, the expert for the claimant uses a figure for expense of operation which is apparently based upon maintenance by the owner, whereas the expert for the government assumes that the owner would take care of outside repairs only. But putting these matters to one side, one principal disagreement between the experts relates to the gross annual rental which can be derived from the building. The government assumes that because of the New York emergency rent laws, McKinney's Unconsolidated Laws, § 8521 et seq., the rental will be 15% more than what the government had been paying; the claimant assumes that the emergency rent laws are practically to be ignored. As a result, the hypothesis of the government is that the building will yield approximately (gross) 54¢ a square foot; the hypothesis of the claimant is that it will yield an average annual rental of about $1.14 a square foot. Therefore, even ignoring the other discrepancies between the two estimates, it is quite understandable why the value contended for by the claimant is nearly double that which the government arrives at, using substantially the same method.

This very bewildering discrepancy led to a long discussion at the trial concerning the emergency rent laws of the State of New York applicable to commercial or business property. Apparently a practice has grown up in this field under which in many instances tenants are compelled to pay rents far above the "standard" increase (15%), or the alternative method of court fixation, by the use of a process which is euphemistically called "arbitration".[11] To put it bluntly, this process involves the securing of a tenant who is willing to pay practically anything for the space and a landlord who has desirable space available. The parties then go through the form of an arbitration and arrive at rentals which, I have no doubt, in many cases approximate

11. As I read the New York commercial rent laws, McKinney's Unconsolidated Laws, §§ 8521, 8524, 8551, 8554, there is a legislative finding (1) that tenant-gouging in respect of commercial or business property was an evil, and (2) that a rent of 15% above the levels obtaining on March 1, 1943, will "curb the evils arising from such emergency". But an alternative is given: the fixation of rents on the basis of specified elements of expense, either (1) by the decision of a court or (2) by arbitration. Thus in theory there should be no very great disparity between the rent arrived at under the arbitration method and that which a court would allow. However, my own experience with such rent cases as have incidentally involved the New York business and commercial rent laws, teaches me that the distinguishing feature of the method of "arbitration" is that it is completely arbitrary and that little or no heed is paid to the theoretical statutory base.

those used by the claimant in this case. This leads to some consideration of whether the emergency rent laws, as they now exist, should play a part in the capitalization method of the appraisal, and if so, how much they count for.

It is, of course, true that no state can, by legislation, establish fixed standards for just compensation under the federal law. But it is also true that one would have to be completely blind to ignore the fact that the declaration of a rent emergency by the legislature of any state, and the enactment of statutes calculated to cure this emergency or alleviate its effects, have a direct and far-reaching effect on real estate values in that state, especially when those values are estimated on an income basis. In other words, statutory formulae set up by the New York legislature for the fixation of rents cannot be considered as mandates binding on the federal court either in whole or in part, but surely they have to be given considerable weight. Above all, the effect of these statutes, I think, has been to make accurate long range estimates of income nearly impossible. No one knows when, if ever, the emergency will be declared at an end. No one can predict with any degree of safety whether the legislature of the State of New York, having decided that the emergency is not over, will or will not take steps to close loopholes in the practice under the statute, such as the "arbitration" method of fixing rents. And it seems to me, therefore, that an appraisal by the capitalization method, which really has for its keystone the notion that from 1947 until 1967 this building will yield a gross rental of $775,000, is entirely unreliable. The basis for the government's capitalization calculations are equally unreliable, even though one can hazard the guess that emergency measures to prevent oppressive rents will never terminate until the economic features which produced the emergency have disappeared. When that time arrives, if ever, values calculated on a capitalization basis will, or should be, extremely close to those calculated on a basis of comparative sales.

And if claimant's value is a true one, it is impossible to explain why capital is not swiftly attracted to the area in which the subject premises are located. Yet one cursory trip through that area leaves the impression that many closely adjacent properties, even on Seventh Avenue, remain blighted. It is not reasonable to suppose that this shy behaviour of capital would occur if it were possible for Tishman to purchase a building in 1945 for $2,800,000 and to demonstrate that in 1947 its sound value for investment purposes is $5,030,000.

Of course, as has been said, claimant explains this terrific disparity by arguing that the Metropolitan in 1945 was liquidating its holdings. But even so, there would still be unexplained the fact that there have been no sales of property remotely like the subject premises at anything like the figures which claimant suggests.

The only conclusion possible in this particular instance is that regardless of its merits in other cases, the capitalization method is simply too hazardous and too uncertain. It would be completely unfair to the government to compel it to pay on any such formula, and would make a mockery of the concept of just compensation.

I need hardly add that everything just said is also conditioned by what I have already observed concerning the general potentialities of the area (or lack of them) even disregarding such accidents as the impact of emergency rent laws. There is no reason to suppose that normal economic pressure will operate to force rental values to the levels suggested by the claimant. Nor is it possible to accept as clearly established one of the key suppositions that lies at the root of claimant's calculations: that the subject premises are easily capable of being rented in units of entire floors. The nearest comparable property (263-281 Seventh Avenue; hereafter called 275 Seventh Avenue) is not occupied under any such scheme. Indeed, it is far more likely that the subject premises will find their best and highest use in a system of rental resembling that actually now practiced in that building (275 Seventh Avenue). The latter premises were cut up into small units, as far as my observation showed (although I visited only two floors). And I believe this tendency towards small units is logical

because I cannot conceive of any strong, consistent demands for entire floors in this particular area despite what claimant's expert said on the point. The record shows what can happen to buildings having extremely large floor space, but situated in an area where the need for it has vanished.[12] The record also shows, on the contrary, how values are maintained by buildings constructed on a smaller scale, but flexible in respect of the use to which they can be put.[13] There is, in my judgment, simply no warrant for a speculation based on general economic tendencies, that the area in which the subject premises are located will undergo some transformation sure to force rentals to levels contended for by the claimant.

B

If the capitalization method is an unsure guide, as I think it is, there is nothing left but to attempt to value the building on a unit basis, taking into consideration for what they are worth the recent sales of property somewhere nearly equivalent to the subject premises. Of these the government seems to concede there are only four, being the sales of the following premises: 55 Fifth Avenue; 522-28 Sixth Avenue (which I shall call the Jonas property); 114 Fifth Avenue (which I shall call the Kress property); and finally 275 Seventh Avenue.

The premises 55 Fifth Avenue are referred to in the record as sale No. 2 (gov't exhibit I). They are located at 12th Street. The ground floor is occupied in part at least by a longchamps restaurant. The building has 18 stories. It was formerly a manufacturing loft building but has been converted to office use. It was originally built in 1911. The sale tendered by the government took place on July 15, 1948, and the total consideration paid was $1,730,000. On a square foot base this sale yields a unit of $4.18 for the building. Claimant complains of the use of this sale, saying it was not a transaction "at arms length"—that both the seller corporation and the buyer corporation were wholly owned by the same individual. Even so, it is almost impossible to understand what motive was to be served by placing upon the transaction a price ruinously low.

The Jonas property (sale No. 3, gov't exhibit B) is on the southeast corner of Sixth Avenue and Fourteenth Street. It was purchased on May 15, 1947, the price being $750,000. After the land value has been separated it appears that the price of the building per square foot was $2.37. Claimant criticizes this sale on the ground that the building is old and in such poor condition that its economic life should be deemed at an end. It is true that the building is old: it was built in 1904 and remodeled in 1916. That it has reached the end of its economic life I doubt very much. The prediction by the claimant is that the building will be torn down when there is a "period of normal balance between real estate value and construction costs", but it cannot be doubted, I think, that it has *some* equivalence as far as the subject premises are concerned. In other words, a buyer who in 1947 could obtain the Jonas building at a building price of $2.37 per square foot would be highly unlikely to pay $5.75 per square foot (claimant's valuation) for

---

12. I am referring to the old Siegel-Cooper building, 616–632 Sixth Avenue, 18th to 19th Streets. It has fallen from its former high estate to that of a warehouse. I know full well that it was built in 1895, and also that in comparatively recent times it was turned over at a large profit. Despite this, it is clear to me that the northward trend of enterprises which could use such a building has reduced it to the status of a white elephant.

13. One example that I have in mind is the premises 114–116 Fifth Avenue, 14 floors of which are occupied by S. H. Kress Co. This is at the corner of 17th Street; the building was built in 1910. It was bought on December 2, 1946, for $1,431,000 yielding a building unit value of $4.14. The land on which it stands is only 16,145 square feet in area. It certainly is one of the best buildings that I inspected. Again, to avoid misunderstanding, I have given full consideration to the claimant's argument that the sale mentioned is not a true standard of comparison because at the time it was made the premises were burdened by an "unfavorable lease" to Kress.

the subject premises, even though the Jonas building may be in bad repair.

The Kress building (sale No. 4, gov't exhibit J) is on the southwest corner of Seventeenth Street and Fifth Avenue. It was sold on December 2, 1946, the purchase price being $1,431,000 yielding a unit price per square foot for the building alone of $4.14 which, it will be observed, is closely in line with the price obtained for 55 Fifth Avenue. Again claimant says the sale ought to be disregarded because at the time of the sale the premises were under lease to Kress at a very unfavorable rental. However that may be, the transaction actually took place, this time at arms length, and, as I have said at another point, the building is one of the best that I looked at.

Finally, an analysis of the sale of 275 Seventh Avenue (sale No. 11, gov't exhibit A) on October 30, 1945, yields a unit building price per square foot of $3.90. I have spoken frequently of this building above. In my judgment it is, as a building, substantially superior to the subject premises, certainly in respect of the uses to which it may be put. Claimant apparently realizes that if 275 Seventh Avenue is an equivalent of the subject premises for the purpose of valuation, then its own theories of value are completely undermined. The argument, therefore, is made that the sale is simply not to be considered at all because, as in the case of the purchase by Tishman from the Metropolitan Life Insurance Company (which yields $3.24 per square foot), it is a situation under which the seller was throwing away its property to bring its portfolio in compliance with the laws of the State of New York. I find it hard to believe this. I can understand the conduct of a life insurance company which (in order to salvage a mortgage investment) has taken over a property and having carried it, might be extremely anxious to dispose of it at the earliest possible time, at least as soon as it had been made whole. But it is hard to visualize such a company achieving that purpose by discarding real estate whose sound value is millions above the purchase price.

Before leaving the subject of comparable properties, a word should be said about the premises 319-335 Seventh Avenue (sale No. 14, gov't exhibit S). These were sold on April 13, 1948. The purchase price was $2,850,000 and analysis yields a building square foot unit price of $5.37. This building runs from 28th to 29th Streets on Seventh Avenue. The side street frontage by contrast with that of the subject premises (250 feet) is only about 100 feet. Claimant says that this sale is a close pattern for the valuation of the subject premises. The building was erected in 1920 and is leased on a multi-tenant basis to furriers. It will be remembered that reference has already been made to the fact that the fur district commences at 28th Street; indeed one of the claimant's experts refers to this parcel as "the fur building". It is surely obvious then, from all that has been said already, that a building unit value of $5.75, ascribed to the subject premises by claimant's experts, is completely out of line with the building unit value actually received (1948) for "the fur building" ($5.37).

It is more than mere coincidence that in the case of three of the comparable sales (55 Fifth Avenue, the Kress building, and 275 Seventh Avenue) and also in the case of the building just under discussion (all of which brought high building prices), the side street frontage is approximately 100 feet and no more. This, to my mind, confirms the views already expressed in connection with the *land* value that depth adds very little after the first 100 feet: but it does more than that. It shows that the buildings, which in recent years have yielded upwards of $4 per square foot in the area covered by the sales, are those having smaller side street frontage. They are, therefore, more flexible and more easily adapted to use in a nondescript district than are the subject premises.[14] The

14. Again I wish to emphasize that when I talk about the value of depth I am speaking only of such areas as those in which the premises are located. It must be obvious that in a department store district depth has a very definite value

fur building, as I have pointed out, is in a class by itself. But in addition it has the physical features of which I have spoken. It is, therefore, true, or so I think, that even a value of approximately $4 a square foot, in the case of a building having approximately 700,000 square feet like the subject premises, could never be justified, to say nothing of the $5.75 square foot value yielded by claimant's application of the capitalization method. It is my finding that at the time of the taking the market value of claimant's building, as such, was certainly not more than $3.50 per square foot, the value for which the government contends.

The record is by no means clear concerning the actual area of the subject premises: there are at least minor discrepancies. The government uses a figure of 700,000 square feet, but at another point it seems to calculate that there are 694,447 square feet. The claimant, however, uses a figure of roughly 682,500 square feet which, I take it, excludes non-rentable area. However, since my valuation of the building is not at all upon an income basis, to eliminate any possible error in this respect, I believe I should use the figure most favorable to the claimant (700,000 square feet) and assign a building value of $2,450,000 at $3.50 per square foot.

Even though repetition is always tiresome, I would like to emphasize at this point that my award for the building in the amount I have mentioned is not based upon any one abstraction or method of valuation, nor on any one isolated circumstance or even set of circumstances. I have tried to take into consideration the physical characteristics of the property, the peculiarities of the area in which it is located, the teachings of the history of property in that area and adjacent areas, my own inspection of the building and of comparable properties, sales which were brought forward on the theory that they involved equivalent build-

ings, and every bit of information that seemed relevant. Nor have I overlooked the criticism made by the claimant of some of the so-called comparable transactions.

I have tried to explain why the capitalization method seems to me entirely unreliable under the circumstances. To state it shortly, and again to repeat, any method which involves a prediction concerning the rental yield of this particular property over a period of 20 years to come, including the minor postulates, such as the method of renting proposed by claimant's experts, and the expenses of operating the building for the same period, is wholly unlikely to produce an award that will satisfy any definition of just compensation that has come to my notice. I acknowledge that the building at the time of my inspection, and undoubtedly at the time of the taking, was in fine repair; this I attribute to the efficiency of the present operating force, and to the amounts which the government has freely expended during the period of its occupancy. That any private landlord would or could continue to maintain the building in such excellent condition is at least debatable. But passing that point, each floor of this building, to one who steps out of the elevator, gives an impression of enormous scope. And no matter how much ingenuity might be applied to the task of cutting those floors up into small units, it would produce a large proportion of undesirable space. Even the large government clerical forces operating on the respective floors seemed lost in acres of floor space. All of these factors taken together compel the conclusion that an over-all price per square foot building unit of $3.50 is, if anything, on the generous side.[15]

### The Period between July 1, 1947, When Possession was Taken, and July 28, 1947, When Title Passed.

It was said at the beginning that there is one comparatively minor dispute between

---

in most cases. It must also be obvious that the same thing would be true concerning Broadway property, and possibly in other areas which are not before me. Here I think depth over 100 feet is a detriment.

15. That in July, 1947 Tishman, or anyone else, would sink appreciably more than $3,000,000 into the purchase of this building is inconceivable to me.

the parties concerning how much should be paid to Tishman to compensate it for deprivation of possession of the premises by the government between July 1, 1947 and July 28, 1947. The claimant, as has been indicated, takes the position that it should receive *rent* for this period, calculated under the theory put forward by its experts. The government, on the other hand, urges that the requirement of just compensation is met by the payment of interest at the rate of 6% for the whole period of possession, based upon the aggregate amount of the award. Rent for the 28 days, according to claimant's evidence, would amount either to $90,241.76 or $64,225. Interest for the same period would, of course, be at a far lower figure than that; in fact, it would be approximately one-fourth of these amounts.

Both sides contend (or seem to) for the proposition that the question is one of law. The claimant cites principally a case of Judge Wyzanski's, U. S. v. 40,379 Square Feet of Land, D.C.Mass. 1944, 58 F.Supp. 246. In that case there was a jury finding that the reasonable value of interim use and occupancy (i. e., for the period between the filing of the petition and the filing of the declaration of taking) was $1,500. Judge Wyzanski was at great pains to supply in his opinion a clear analysis of the whole problem. He reached the conclusion while interest *may* be just compensation for use during such interim periods, this is not always so: cases are conceivable where an award of interest alone will be inequitable to the claimant. But Judge Frank, writing in U. S. v. 6.87 Acres of Land, 2 Cir., 1945, 147 F.2d 351, 353, says: "Appellant contends that the judgment is inconsistent in that the 6% interest allowed on the award amounts to substantially less per day than the rental value allowed to the tenant 'for the same damages.' This argument rests on a misunderstanding of the reason for allowing interest. The interest is not allowed as compensation for the use of the property but as compensation for delay in payment of the award. As to the rate of interest allowed, see 40 U.S.C.A. § 258a; New York General Business Law, Consol.Laws, c. 20, § 370." Still later Judge Chase discusses the question of interest, under circumstances probably materially unlike those in the case at bar, U. S. v. 53.25 Acres of Land, 2 Cir. 1949, 176 F.2d 255, 258, saying that in cases under the 1931 Act, 40 U.S. C.A. § 258a, the procedure under earlier acts is to be applied so that "when possession of the condemned land is taken before payment interest for the interval is part of the just compensation" (citing cases). Judge Chase's case was published after the trial of the case at bar; undoubtedly the claimant could and would attempt to distinguish it, since the Court was dealing with an interim between possession and payment, and not specifically with an intertim between possession and title. However, I do not think it is here necessary to apply any rigid rule but rather to discover, if I can, what, in these circumstances, the demands of equity are.

If I compensate the claimant with 6% on the award here made ($3,090,000) for the period July 1, 1947 to July 28, 1947, it will have received a sum for those 28 days aggregating roughly $15,000. Under the rent theretofore paid by the government ($320,000 per annum) the net return to the claimant would not have been very much greater. Moreover, in dealing with factors involved in the award which are difficult to calculate exactly (such as the actual square foot area of the building), the government has resolved every doubt in favor of the claimant, which probably has resulted in minor arithmetical inaccuracies weighting the award also in favor of claimant.[16] Therefore, on balance, it

16. It is, of course, true that in condemnation cases such as this it is nearly impossible to calculate the exact square foot area of any given building. Claimant has used a figure of 682,500, which I think is rentable area for purposes of the capitalization method (eliminating courts, etc.). The government, in its analysis of the sale to Tishman uses a figure of 694,447. But in calculating its estimated value the government uses 700,000 square feet and so have I. Assuming a discrepancy of only 3,000 square feet in favor of the claimant, it

seems to me that the equitable thing is to treat the declaration of taking as having been filed not on July 28, 1947, but on July 1, 1947. It would certainly be a vain thing, and in fact nearly impossible to say what is the actual use and occupancy value for 28 days of a property like this. The values of approximately $90,000 and $60,000 suggested by claimant are simply shocking (the *gross* rental paid by the government up to June 30, 1947 having been at the rate of about $26,000 per month). Nor was there any lengthy or undue delay in the filing of the declaration and the deposit of the money by the government. In short, this is a case, to me at least, where an award of 6% interest from the date possession was taken is wholly adequate and equitable.

### Summary.

■ I have made no findings of fact or conclusions of law as such because, under the specific instruction of the Court of Appeals, U. S. v. 6.87 Acres of Land, supra, I need not. But I summarize the elements of the judgment and of just compensation as follows:

| | |
|---|---|
| Award for land and corners, Seventh Avenue frontage (19,750 square feet).... | $333,750. |
| Side street lots, (29,625 square feet) | 177,750. |
| Plottage increment.. | 127,875. |
| | $639,375. |
| (in round figures)... | $ 640,000. |
| Award for building, (roughly 700,000 square feet) | 2,450,000. |
| Total .......... | $3,090,000. |

For the period July 1, 1947 to July 28, 1947 the claimant is entitled to an additional amount, being the equivalent of 6% interest on the total award ($3,090,000).

will thus be seen that the award would be at least $10,000 over and above what an exact arithmetical formula would yield. I do not mean to intimate that there is any room for pioneer justice in

■ After July 28, 1947, equivalent compensation for delay in payment (interest) would run only on $90,000, since the making of the deposit of July 28, 1947 ($3,000,000) cut off "interest" on the amount deposited, under the authorities. Normally, therefore, plaintiff in addition to the amount spoken of would be entitled to 6% on $90,000 from July 29, 1947 to the date of payment. But from this amount there is to be deducted interest at 6% on the same amount for the period January 11, 1949, to March 3, 1949, because there was a stipulation to this effect made between the parties in connection with the arrangements for trial.

This is a case in which the claimant recovers "only money" and, therefore, under the strict language of the pertinent rule, Fed.Rules Civ.Proc., rule 58, 28 U.S.C.A., the clerk should enter judgment. However, in order to eliminate, if possible, any disputes over the exact amounts of interest I think that here the judgment should be proposed and settled on notice.

### Supplemental Opinion.

On July 1, 1947 the government filed its petition for the condemnation of 49,375 square feet of land including buildings (252 Seventh Avenue, New York City), owned by the defendant Tishman. On July 28, 1947 a declaration of taking was filed and a deposit made of $3,000,000. The matter came on before me for trial, and on January 17, 1950 I filed an opinion, with which familiarity will be assumed, fixing just compensation to Tishman in the sum of $3,090,000 for the land and buildings.

Prior to the entry of judgment and on January 25, 1950 I conferred with counsel for the government and for Tishman. The latter suggested that he desired a "rehearing" and in effect a new trial. *Mea sponte* I suggested that counsel for Tishman put his application into the form of a motion, which was done (March 10, 1950). On March 17, 1950 the government filed its

cases of this kind; my point is that, on the whole, an award of 6% interest from the date of possession (July 1, 1947) is equitable.

reply, and a hearing was held in open court on March 22, 1950 and again on April 5, 1950.

The procedural question is not without difficulty. Tishman points out that the Conformity Act, 40 U.S.C.A. § 258, applies to proceedings under the Declaration of Taking Act and that while ordinarily federal judges consult the condemnation law of the state in which they sit, see U. S. v. Certain Lands in Brooklyn, D.C.E.D.N.Y. 1941, 39 F.Supp. 91, the practice in this district has been not to appoint commissioners, as is done under state law, but to conduct hearings before the court, as is done under the City Charter and Administrative Code. Tishman argues from this that the practice under the statute last named is, and should be, to submit "tentative decrees" after the court's decision has been filed, and then to argue the objections and cross-objections to the tentative decree, which practice is in many respects equivalent to an application for a new trial or for a rehearing.

The contention of the government is that a condemnation proceeding instituted by the United States is an action at law, not a suit in equity, citing U. S. v. Certain Lands, D.C.E.D.Missouri, S.D.1947, 72 F. Supp. 875, and Kohl v. U. S., 1876, 91 U.S. 367, 23 L.Ed. 449, and that this is true even where the court dispenses with commissioners of appraisal. Therefore, the government argues that under the Conformity Act, the only bases for the granting of a new trial are the familiar ones of misconduct, newly discovered evidence, surprise, or failure to file a decision (citing Carmody, New York Practice, Vol. IV, Sec. 1431, p. 3290). And the government asserts that there is considerable doubt concerning the power or authority of the trial court to make any substantial change in or revision of its decision (citing Miltenberg & Samton, Inc., v. Falkingham, 1st Dept. 1948, 273 App.Div. 631, 78 N.Y.S.2d 704.

As the record taken at the hearings will show, I was, and still am, reluctant to attempt to decide the procedural question, and perhaps in this way set an unfortunate precedent. I, therefore, suggested that counsel for Tishman make an offer of proof in such form as he might be advised

(e. g., affidavits, schedules, etc.) setting forth any facts not theretofore embodied in the record which, in his judgment, supported the contention that my original decision ought to be revised. In response to this suggestion Tishman's counsel, prior to the hearings in open court, sent me a letter (January 27, 1950) in which is to be found a summary of his contentions. The factual support for the argument was later supplied in the form of affidavits and schedules. All of these papers, including the letter referred to, are part of the supplemental record. It is convenient to consider *seriatim* the points raised by Tishman's counsel in the order that they appear in his letter, at least to the extent that they refer to "new matter".

Tishman points out that in the early part of 1946 it received an offer to purchase this property and the price suggested by the purchaser was $3,500,000. The government urges, citing respectable authority, that in condemnation proceedings offers to purchase are inadmissible, and that in any event Tishman, at the main trial, had the facts in its possession and neglected even to attempt to bring them forth.

But, even assuming that such evidence were admissible, I consider that its evidentiary value is practically nil. No one can tell what was in the mind of the purchaser. Perhaps he erroneously expected that rent controls would be abolished or materially abated; perhaps he anticipated a quick turnover of the property. Tishman complains that in the main opinion I relied upon at least one sale, which involved an intercorporate transaction. Certainly a mere offer to purchase is far less reliable than such a sale, even assuming that Tishman's criticism of the particular sale has a sound basis in fact.

The second head of "new matter" put forward by Tishman concerns itself with proceedings taken in the Supreme Court, New York County, concerning 345 Hudson Street. In those proceedings on January 6, 1950, Mr. Justice Cohalan fixed rent to be paid by various tenants, including Miles Shoes, Inc., which concern was then represented by Tishman's counsel. Mr. Justice Cohalan's decision shows that he used the

assessed valuation, and on that basis fixed the value of the building at $4,500,000. The court then arrived at a rental value of $1.26 per square foot under a method laid down by state statute. Emergency Commercial Space Rent Control, Law, Laws 1950, Ch. 327, Sec. 4, McK.Unconsol.Laws, § 8521 et seq. The decision is now under appeal to the Appellate Division, First Department.

Tishman's counsel offered to prove all the facts developed in the proceeding, apparently on the theory that the use of the capitalization method was approved by Mr. Justice Cohalan, and that a return of 8% was found to be equitable. But the fact is that Mr. Justice Cohalan merely employed a statutory formula by which he was bound and there is nothing in the decision that sheds any light generally on the validity or invalidity of the capitalization method. Moreover, at all relevant times the assessed valuation of the Hudson Street premises exceeded by more than $1,000,000 the assessed valuation of the subject premises, and Tishman claims that the actual 1947 value of the subject premises was slightly less than double the assessed valuation. Even allowing for comparatively minor discrepancies, therefore, the owner of 345 Hudson Street is receiving considerably less than 8% of the actual value, if Tishman's theories have any foundation at all. To put it in another way, if one employed the statutory formula in connection with 252 Seventh Avenue, using the assessed valuation as a basis for calculation, the return would be nowhere near as large as that to which Tishman now lays claim.

But the matter can be put on even broader grounds than these. Even though the legislature of the State of New York has seen fit to set up a statutory guide for the fixation of rents (a guide which under no circumstances could be binding in a federal condemnation), I still say that to employ the capitalization method in arriving at the true value of business property involves, among other elusive factors, a prophecy concerning the future of rent control. Such prophecies are "guesses, not informed forecasts", as Mr. Justice Black said speaking of predictions concerning the future behavior of the legislature in respect of price fixing. U. S. v. Commodities Trading Corp., 1950, 339 U.S. 121, 70 S.Ct. 547, 551.

I told counsel at the argument that I would take a view of the property at 345 Hudson Street, since there seemed to be some claim that this building was comparable (perhaps inferior) to the subject premises. I have already spoken of the fact that 345 Hudson Street is assessed by the City of New York at over $1,000,000 more than the premises at 252 Seventh Avenue. I turn now to the physical condition of the Hudson Street building.

The premises at 345 Hudson Street occupy practically the entire block on Hudson Street between King and Charlton Streets. On the rear portion of that block there is a small garage. Opposite the building to the east is 350 Hudson Street, a large modern building. To the south on the corner of Charlton and Hudson Streets is a 10-story building, and across the street to the east from that are the premises of the Waterman Pen Company. Directly to the north on the west side of Hudson Street is a small inadequate building with a frontage of about 20 feet, and to the north of that is a parking space. Across the street from this tract, on the east side of Hudson Street between King and West Houston Streets, is a modern building occupying the entire block front.

345 Hudson Street itself is a modern building with 14 full floors and three setback sections above the 14th floor each consisting of three floors. It is said in the papers that the Hudson Street area is inferior to that surrounding 252 Seventh Avenue. While it is true that there is some blighted property directly across from 345 Hudson Street, on Charlton Street between Hudson and Greenwich Streets, it is also generally true that the large buildings on Hudson Street itself in the area of the premises under discussion are modern and are obviously well kept up and well managed. It is quite likely, as Tishman urges, that the subway facilities are not so good in the Hudson Street area as they are near 252 Seventh Avenue; but certainly trucking and unloading facilities are far superior. The building at 345 Hudson Street

nas at its rear (toward Greenwich Street) a huge loading platform which runs between King and Charlton Streets. The New York Union Motor Truck Terminal is on the west side of Greenwich Street, not much more than 100 feet from the loading platform in 345 Hudson Street. The tenants who occupy 345 Hudson Street obviously get and require a considerable amount of service, as the nature of their business would indicate.[1] Some of the ground floor occupants of 345 Hudson Street are concerns like Tension Envelope Company, Symons Associates (an insurance concern), and F. M. Charlton, a book binder.

Nothing that was brought out in connection with the building at 345 Hudson Street, including my own view of that property, has changed my original opinion concerning the value of the subject premises.

The respondent complains that my main decision is susceptible of "unfavorable inferences": (1) because I mentioned that Tishman had used a dummy when it purchased the property in suit, and (2) because I implied that Tishman had invited or welcomed the institution of condemnation proceedings. Concerning the first point, I have said to counsel again and again, and I reiterate, that the use of "dummies" in the purchase of real estate is a common practice, that there is nothing wrong about the practice as such, and that I do not believe any inference against Tishman ought to be taken from the fact that it resorted to this common, and in most instances, sensible procedure. Moreover, as I have indicated above (when I discussed the 1946 purchase offer), I do not believe that Tishman bought the property in anticipation of a condemnation. I believe that the corporation thought that the government would relinquish possession, that quite possibly rent control would either be terminated or weakened, and that if these things happened the company had a good long-term investment.

Several other contentions of respondent are supported by proof in the form of affidavits and schedules said to show that the rent market has continued to be firm for commercial loft space in the neighborhood of the subject premises and generally in the Borough of Manhattan since the trial of this proceeding: that there has been stability of rents fixed under the "arbitration method", to which reference was made by me in the main opinion. Among the schedules is one showing that various New York Supreme Court Justices have used the statutory capitalization method, as Mr. Justice Cohalan did, with the result that there has been an average increase of commercial rents by over 25%. Implicit in this argument is the assumption that the capitalization method alone produces a just valuation, and that despite the vagaries and uncertainty of legislative rent control, and particularly of the "arbitration method", this experience furnishes a reliable basis for a long-range prediction of income. I am by no means persuaded that any of these assumptions is valid; certainly if the legislature had tightened control after the date of the trial, and rents had become more unstable than they are, it would be a piece of injustice to reduce Tishman's award on a motion by the government for a revision of the decision. By the same token, the alleged stability of the rent market does not furnish a reason to unravel the judgment and to accept the notion that state fixed formulae, whether they produce high rentals or low rentals, should be accepted as rigid guides to decision.

The remaining criticisms of my decision presented by the application are 21 in number.[2] (The formal motion papers renumber these objections under 17 heads.) These criticisms are in many instances specific, but it is fair to say that they can be summed up as follows: (1) that I rejected the capitalization method in favor of the comparable sales method, using an "either-or" approach, (2) that I gave undue weight to the effect of rent control, (3) that the comparable properties were so few in number and so different from the subject premises as to make such evidence worthless, (4)

---

1. The tenancies are set forth in a schedule annexed to a fact-summary in the record.

2. Letter of January 27, 1950.

that I left rentals altogether out of consideration, (5) that I erred in the treatment of depth value of the land, and (6) that the result of all these and other errors on my part was to set a value on the subject premises which does not and did not represent just compensation under the Constitution.

It can be seen at once that the respondent, under this head of its argument, is simply asking me to reverse myself, to adopt the capitalization method, and to enhance the award by using a theory of valuation which I have previously characterized as wholly unreliable. Moreover, as to the claim that I used an "either-or" approach and left many material matters entirely out of consideration, I can only reiterate what I said before: "Even though repetition is always tiresome, I would like to emphasize at this point that my award for the building in the amount I have mentioned is not based upon any one abstraction or method of valuation, nor on any one isolated circumstance or even set of circumstances. I have tried to take into consideration the physical characteristics of the property, the peculiarities of the area in which it is located, the teachings of the history of property in that area and adjacent areas, my own inspection of the building and of comparable properties, sales which were brought forward on the theory that they involved equivalent buildings, and every bit of information that seemed relevant. Nor have I overlooked the criticism made by the claimant of some of the so-called comparable transactions."

Neither Mr. Justice Cohalan's action in connection with 345 Hudson Street, nor the 1946 offer made to Tishman, nor the alleged stable trend toward high rentals would have changed my conclusion as to the value to be put upon the subject premises. Therefore, whether the application be treated as a motion for rehearing or a motion for a new trial, or as objections to a proposed tentative decree, I would adhere to my original decision. A judgment has already been proposed and is before me. If the respondent has any objections to the form of that judgment, it has leave to propose a cross-judgment within five days after the filing of this opinion.[3]

---

3. The government complains that the last paragraph of my original decision reads as if I thought the Federal Rules of Civil Procedure were applicable to condemnation suits. I am under no such misapprehension, and my reference to the rules was inadvertent. However, the substance of what I had to say was correct: even if the Rules do not apply to condemnation suits, the practice in connection with the entry of judgment in any district should be uniform. I believe that the changes made by the Rules of Civil Procedure ought to be, and undoubtedly will be, reflected in the local rules so as to prevent any unnecessary delay in the entry of judgment, at least where there are no complications concerning form.